Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 6103 | **DATE** | 8/31/2001 |
| **CASE TITLE** | U.S.A. ex rel Gregory C. Pecor vs. Thomas F. Page | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: The State courts accurately applied the correct federal law. Therefore, Pecor's petition for a writ of habeas corpus [0-1], dated 9/30/1998, is denied. This case is terminated.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | SEP 0 4 2001 | |
| | Notices mailed by judge's staff. | | date docketed | 45 |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | FILED FOR DOCKETING | | |
| | Copy to judge/magistrate judge. | 01 AUG 30 AM 8:07 | date mailed notice | |
| TSA | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. GREGORY C. PECOR, <br><br> Petitioner, <br><br> v. <br><br> THOMAS F. PAGE, <br><br> Respondent. | No. 98 C 6103 <br><br> Judge Wayne R. Andersen |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the 28 U.S.C. §2254 petition for a writ of habeas corpus brought by Gregory Pecor. After a jury trial, Pecor was convicted of murder, armed robbery and residential burglary and was sentenced to a term of life in prison without parole for the charge of murder, thirty years imprisonment for the charge of armed robbery and fifteen years imprisonment for the charge of residential burglary. In the instant petition, Pecor alleges that: (1) the jury was unconstitutionally selected and impaneled in violation of Batson v. Kentucky, 476 U.S. 79 (1986); and (2) he was denied the effective assistance of counsel. For the following reasons, his petition is denied.

## BACKGROUND

The following facts are the facts as set forth by the court in Pecor's appeal to the Illinois Appellate Court. People v. Pecor, 286 Ill.App.3d 71, 675 N.E.2d 141 (1st Dist. 1996). We accord a presumption of correctness to these state court findings. 28 U.S.C. §2254(d).

At trial, the defendant did not dispute the fact that he killed the victim, Carol Holwell, on Friday, February 14, 1986. He contended, however, that he did not possess the requisite mental state to commit the offense of murder due to a long-time addiction to alcohol and cocaine and his ingestion of cocaine on the day of the murder.

The evidence at trial showed that the defendant had previously lived with Steve Otten, a drug dealer who supplied the defendant with cocaine, and Otten's live-in girlfriend, Carol Holwell, the victim. After the defendant moved out of Otten's house, he continued to purchase cocaine from Otten; and the relations between the three were amicable. Testimony by Merrionette Park Police Officer James O'Connell and Assistant State's Attorney Matthew Carmody showed that during questioning at the police station the defendant admitted that he stabbed the victim after entering Otten's home and being surprised by her presence. The defendant told them that after he thought Holwell was dead, he attempted to open a safe in Otten's house. As he was removing its contents, he heard a noise, ran and saw the victim going out the side door. The defendant stated that he dragged her back into the house, grabbed the knife again, took her down the hallway, jumped on top of her, "started cutting her again," and killed her. He then returned to the safe from which he took a .45 caliber automatic pistol, some cocaine and $1,900. Those items, which were recovered from the defendant's home, pursuant to the defendant's instructions to the police, were introduced into evidence. Other physical evidence and exhibits which connected the defendant to Holwell's killing, not here relevant, were introduced by the State.

The defendant, who was 32 at the time of the killing, testified that he began using drugs when he was a freshman in high school. At that time, he used marijuana and alcohol and experimented with LSD, mostly on weekends. While in the army, he used cocaine and barbiturates and regularly injected heroin into his veins. He continued to use drugs and alcohol on a daily basis after he left that service in 1973. The defendant stated his drug and alcohol usage on a daily basis continued during the 1970's; that in 1981, he enrolled in and successfully completed an in-patient alcohol abuse program at Hines Veterans Hospital; and that he abstained from alcohol and drugs for about six months. The defendant stated that from the summer of 1983 until the summer of 1984, he lived with Steve Otten, a boyhood friend. Carol moved in sometime in January 1984. During that time the defendant bought cocaine from Otten and continued to do so after he moved out. The defendant said that Otten kept the cocaine and the chemicals used for processing it in a safe in the closet in his bedroom. Otten gave the defendant the combination.

The defendant further testified that during late fall 1985 and early winter 1986 he was unable to find steady employment and his cocaine usage steadily escalated. He was using between one and one-half to two and one-half grams per day and began "free-basing" as well as "snorting." The defendant stated that after using cocaine he would get so "wired up that [he] would get trembles, tremors and * * * would shake." To counter that reaction, he would drink alcohol.

The defendant stated that on February 14, 1986 he ingested about one-quarter to one-half gram of cocaine in the morning. In the early afternoon he went to Otten's house to drop off some money he owed for cocaine. (At that time, the defendant's consumption

2

of cocaine had increased to two to four grams per day.) Carol was there so he gave her the money. They talked for about a half hour, the defendant had a beer and left. Sometime after 5:00 p.m., the defendant realized he did not have enough cocaine for the weekend so he went back to Otten's house. He stated that he did not expect anyone to be there and went to the back door, which was never locked, went to the safe in Otten's bedroom and opened it. On the dresser nearby was a dirty plate and small steak knife. The defendant took the knife, dipped it into the envelope containing cocaine, snorted the cocaine, got an immediate "rush" and then saw someone walk into the room.

The defendant testified that for the next several days he had no conscious memory of what transpired in the room. He stated that he did not know that he had killed Carol when he initially spoke to the police on the following Sunday and Monday. He stated that he first began having flashbacks of being at Otten's house on Tuesday when he was questioned at the police station by an officer. The defendant stated, "I was like in a movie that whenever he reminded me of something, or he would say something that it [sic ] would recall a memory of my being over at the house on Friday afternoon." He said that he realized he killed Carol and began talking to the police about what he remembered after the assistant state's attorney told him his bloody palmprints were found on the handle of the steak knife.

On cross-examination, the defendant denied that he told any police officer or assistant state's attorney that after Holwell fell to the floor he went back to the bedroom to look for money. He also denied saying that he saw Holwell crawling away and stabbed her in the back. The defendant also testified that he used cocaine in the parking lot of the police station on Tuesday evening before he went into the station and that he left four grams of cocaine in the glove compartment of his car. He stated that he felt a rush but that he had no trouble navigating through the police station, understanding what was being said to him or responding to the questions. He admitted that he refused to sign the statement that had been prepared for him and stated that he was never asked to give a statement to a court reporter.

James Thomas O'Donnell, a defense witness and expert in the field of pharmacology and pharmacy, testified that cocaine can have an effect on a person's memory and can cause blackouts where one does not recall what he or she did but was awake while doing it. On cross-examination, O'Donnell admitted that the effect cocaine would have on a person could not be determined without knowing the purity of the drug. On redirect, O'Donnell stated that cocaine is a mind-altering drug that can "affect a person's ability to act in a knowing fashion, knowing what he's doing." He also stated that it could alter a person's judgment and mind to the effect that the person does not know what he intentionally is doing. On recross, he stated that his knowledge of cocaine was not based on first-hand experience, experimental clinical studies or observations of cocaine use.

On rebuttal, an assistant state's attorney testified that on the Tuesday evening while the defendant was being questioned, he never presented the defendant with a typed statement to sign; the defendant originally agreed to give a court-reported statement but changed his mind; and the defendant stated that he stabbed Holwell, went to the safe to

search for money, and stabbed Holwell again as she attempted to crawl away. That testimony was corroborated by one of the officers who was present in the interview room on Tuesday evening. Three officers testified concerning defendant's claim that he ingested cocaine immediately before entering the police station on Tuesday evening. One officer who was driving a police car and followed the defendant as he drove to the police station, stated that he pulled his car behind the defendant's car upon their arrival at the station. He stated that the defendant remained in his car long enough to shut off the engine and exit the car. He also testified that he was present during the execution of the search warrant of the defendant's car and that no cocaine was recovered from the glove compartment. A second officer, who observed the defendant when he arrived at the police station, stated that he saw nothing that would indicate that the defendant had taken any kind of intoxicant. A third officer testified that he observed the defendant after he had pulled his car into the police station driveway and that the defendant stayed in his car for approximately fifteen seconds before exiting it. The State then introduced defendant's three prior robbery convictions for purposes of impeachment.

At the sentencing hearing, Doctor Gerson Kaplin, a psychiatrist, testified that he examined the defendant to determine whether he was fit to stand trial and to determine his mental status at the time of the alleged crime. During the examination, the defendant appeared coherent and rational and gave appropriate answers to the questions asked. The defendant told him that he decided to rob Otten's house since he was familiar with it, knew it was unlocked, knew the combination to the safe, expected to find drugs and money, and thought no one would be home. The defendant also told him that while he was taking the money and drugs, the victim surprised him. As he started to leave, he took a knife that was lying on the kitchen table and stabbed her several times. He stated that when the victim attempted to crawl away, he stabbed her a few more times and then went home. Kaplin further stated that the defendant told him that he was drinking that day but that he knew what he was doing. According to Kaplin, the defendant told him what happened in a clear and concise manner. On cross-examination, Kaplin stated that the defendant told him that he did not know why he stabbed the victim.

The State then called three individuals who were the victims of robberies wherein the defendant was one of the perpetrators. Two of the victims stated that the defendant sprayed mace on them and a third stated that another man with the defendant was carrying a knife. A fourth witness, Officer J. Moller of the Alsip Police Department, testified that the defendant was involved in a fourth robbery wherein the victim stated that the defendant had hit him over the head, choked him, punched him, and kicked him in the face. According to Moller, there no probable cause for the robbery charge because the victim was unconscious when the property was taken.

Also admitted into evidence was defendant's misdemeanor theft conviction in 1974 for which the defendant received one year adult probation and defendant's military records which indicated that action was taken against him for possession of marijuana and for desertion for having returned three months later from leave.

The defendant then presented the testimony of a former girlfriend who indicated that he had treated her and her children well during the year and a half period of time that

they were dating and the testimony of three Cook County Department of Corrections employees who testified concerning the defendant's behavior while he was an inmate. One, a deputy sheriff, indicated that the defendant worked for him in an entrusted area and that the defendant was honest and respectful. The other, who was in charge of special services and maintenance, indicated that the defendant had worked on his crew for about fourteen months and during that time had not presented any behavioral problems. The third, a mental health specialist, indicated the defendant was respectful of him and the officers, had never been in any fights, had never been in any trouble, helped keep order in the dorms, was a stabilizing influence and participated in many work activities. On cross-examination, he stated that he was aware that the defendant had once stockpiled medicine on took 18 pills "to get high." Additional witnesses who testified as to the defendant's good character included a friend, who had known the defendant for twelve years and who tried to start a business with the defendant; the defendant's mother; the defendant's two brothers; and a next-door neighbor.

Doctor Jean Daley, a psychologist, testified that she conducted a psychological evaluation of the defendant over a three to four hour period of time. In connection with her evaluation, she also reviewed the psychiatric evaluation of the defendant, a Veteran's Administration hospitalization report, the psycho-pharmacologist report, some reports from the county jail, the state's attorney's interviews and police reports. In those reports, she saw depression, evidence of blackouts, feelings of disorientation, loss of self, a daze-like trance, and alcoholic and drug needs. Based upon those reports and her evaluation interviews with the defendant, Daley opined that the defendant was an alcoholic dependent person, a cocaine abuser and had suffered "from a brief reactive psychosis."

Daley described cocaine usage, the euphoric effects of the drug and its addictiveness. She stated that in the advanced stages of addiction, paranoia is common and the person loses his or her sense of reality and is unable to distinguish between what is real and what is not real. She stated that if the person is addicted and cannot obtain the drug, he or she becomes "totally discombobulated" and is "totally destroyed and disorientated, [and is] fixated on getting more." She also stated that blackouts and psychosis are possible results of cocaine abuse. She defined psychosis as a loss of sense of reality, where the mind hallucinates and has delusions and where the person may believe that someone is out to kill or destroy him. In Doctor Daley's opinion, the defendant was addicted to cocaine and alcohol, he believed he was incapable of functioning without them, and he felt totally inadequate.

Daley defined a "reactive psychosis" as a brief psychotic break, lasting from two hours to a few weeks, after which time the person could function again. Daley stated that the psychosis is induced by extreme stress and internal environmental stress. According to Daley, the person who is in this state of agitation and anxiety projects that anxiety outward while trying to deal with what that person believes is an enemy that is "after" him or her. Daley stated that the pressure can become overwhelming such that an explosive reaction occurs. In Daley's opinion, at the time the defendant killed Carol

Holwell, he was in a highly agitated state. He had to have drugs because he was going away for the weekend and did not want to be "exposed."

On cross-examination, Daley stated that she believed the defendant was disoriented and detached from reality for a couple of days before the killing and that the psychotic break occurred when he was at the safe. She stated that when she questioned the defendant she did not ask him specific questions regarding his activities that preceded the killing because she was "not interested in that." She also stated that the defendant was not in a psychotic reactive state when he left his house on the afternoon of February 14, 1986.

At the conclusion of the sentencing hearing the jury found that there were mitigating factors sufficient to preclude a death sentence.

On direct appeal defendant Pecor raised several issues. The Appellate Court limited its consideration to whether the trial judge erred in ruling that the defendant, a white male, did not have standing to object to the prosecution's use of peremptory challenges excluding venire persons from the petit jury. Based on Batson v. Kentucky, the trial court ruled that Pecor did not have standing to object to the exclusion of black venire persons because he was not a member of a cognizable racial group and that the juror's were not members of the defendant's racial group. Batson v. Kentucky, 476 U.S. 79, 90 L.Ed.2d 69, 106 S.Ct. 1712 (1986). The Appellate Court reversed the trial court's ruling and remanded the case to the trial judge with instructions to conduct a Batson hearing.

The Appellate Court held that Pecor, a white male, had standing to object to the prosecution's use of peremptory challenges excluding black venire persons from the petit jury. Between the time that the trial court ruled and the Appellate Court considered the case, the United States Supreme Court decided Holland v. Illinois, 493 U.S. 474, 107 L.Ed.2d 905, 110 S.Ct. 803 (1990). In Holland, the Supreme Court held that a white criminal defendant has standing under the Constitution to raise an objection to the prosecution's use of peremptory challenges excluding black venire persons from a petit jury; but such exclusion was not a

6

violation of the fourteenth amendment. Id. at 474. After oral argument in this case, the Supreme Court decided Powers v. Ohio and held that a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race. Powers v. Ohio, 499 U.S. 400, 113 L.Ed.2d 411, 111 S.Ct. 1364 (1991). The Appellate Court applied Powers retroactively to Pecor's appeal. The Appellate Court found that the defendant raised a legitimate and well grounded objection as propounded in Powers and Illinois case law because the prosecution used four of its first five peremptory challenges to exclude black venire persons.

The State appealed the Appellate Court's ruling to the Illinois Supreme Court. The Illinois Supreme Court, in a lengthy and well reasoned opinion, affirmed the Appellate Court's decision holding that the defendant should be allowed to create a record and present to the trial court evidence of a prima facie case under Batson. Pecor, 153 Ill.2d at 125-26.

On remand, the trial court conducted a Batson hearing. At the conclusion of the Batson hearing the trial court found that the state provided race-neutral explanations for its exclusion of six black venire persons and that no Batson violation had occurred. Pecor appealed the trial court's Batson ruling to the Illinois Appellate Court. The Appellate Court affirmed the trial court's ruling. On June 4, 1997, the Illinois Supreme Court denied Pecor's petition for leave to appeal. On November 10, 1997, the U.S. Supreme Court denied Pecor's petition for Writ of Certiorari.

Pecor filed this present petition for a writ of habeas corpus on September 29, 1998 pursuant to 28 U.S.C §2254.

## DISCUSSION

I. Standard of Review

A federal court may issue a writ of habeas corpus if a petitioner demonstrates that he is in state custody in violation of the Constitution or law or treaties of the United States. 28 U.S.C § 2254(a); McGowan v. Miller, 109 F.3d 1168, 1172 (7th Cir. 1997). The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. §2254, provides, in pertinent part, that habeas relief may be granted only if the adjudication of the claim by the state court: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C §2254(d).

In Williams v. Taylor, 529 U.S. 362, 146 L.Ed.2d 389, 120 S.Ct. 1495 (2000), the Supreme Court attempted to clarify the applicable standard of review within the meaning of AEDPA. The Court noted that the text of AEDPA does not explicitly prescribe a recognizable standard of review for applying either of the statutory clauses. Id. at 385. The Court recognized the need for further clarification and direction to federal courts and concluded that "AEDPA plainly sought to ensure a level of 'deference to the determinations of state courts,' as long as those decisions do not conflict with federal law or apply federal law in an unreasonable way." Id. at 376. Additionally, the Supreme Court determined that "Congress wished to curb delays, to prevent 'retrials' on federal habeas and to give effect to state convictions to the extent possible under law. When federal courts are able to fulfill these goals within the bounds of the law, AEDPA instructs them to do so." Id. at 376. Therefore this court is directed to apply a

deferential standard of review to state court decisions unless we determine that the state court violated federal law.

II.   Alleged Batson Violation

Pecor argues that the trial and Appellate Court were unreasonable in determining that no Batson violation occurred. For the following reasons, we find that the State's exclusion of venire persons was race-neutral, the jury was properly impaneled, and that the trial and Appellate Court applied the correct legal standard.

When a defendant objects to the State's exclusion of venire persons alleging that the exclusions were based on race, the defendant must establish a prima facie case of discrimination. The defendant must show: (1) that the prosecutor used peremptory challenges to remove members of a racial group from the venire; and (2) that these facts and any other relevant circumstances raise an inference that the prosecutor used his challenges to exclude potential jurors based on race. Batson, 476 U.S. at 96-89. The defendant is entitled to rely on the fact that the peremptory challenges enable those to discriminate who are of a mind to discriminate. Id. at 96. In deciding whether the defendant has established a prima facie case, the trial court must consider all relevant circumstances, including such matters as patterns of strikes against black jurors in the venire and the prosecutor's questions and statements in voir dire and in exercising his challenges. Id. at 96-97. The defendant can also point to similarly situated individuals who were not excluded from the venire. Once the defendant has established a prima facie case the burden shifts to the state to present a race-neutral explanation for the challenges to black jurors. Id. at 96-97.

On remand the trial court was not convinced that the defendant had established purposeful discrimination, but, in the interest of judicial economy, proceeded on the basis that a prima facie case had been established. Therefore, the burden shifted to the state to provide race-neutral explanations for its challenges.

In this case, the issue is whether the trial and Appellate Court erred in finding no <u>Batson</u> violation. At the time of trial there were six venire persons struck from the jury. Four were struck before the defendant's motion and two after the defendant's motion. Five venire persons were the subject of the <u>Batson</u> challenge and the subsequent appeal. The following is the Appellate Court's interpretation of the <u>Batson</u> hearing.

> (1) Chuck Edmonds
> This venireprerson was a 53-year-old ticket agent with the Chicago Transit Authority. He held that position for eight years; was single; had lived in Chicago area for over thirty years; and had a sixteen-year-old son who sometimes resided with him. He was a veteran, having served in the army from 1951 to 1954 and belonged to the Chicago Urban League, Operation PUSH and the American Legion. When asked by the trial judge what he did before becoming a ticket agent, Edmonds responded, "Student." When asked whether he had any "feelings or viewpoints concerning the defense of intoxicated or drugged condition in a criminal case," he replied that he did; and at the request of defense counsel, further explained that
>> "Its just one of the most horrendous things society has allowed to perpetrate [<u>sic</u>] the last 10 or 15 years is the whole thing of crime and drugs, and most of all ridiculous crimes seem to be drug or alcohol related, and me as a father of a 16-year-old child, and I live in the inner city, I see this constantly."
>
> Edmonds further stated that he did not think his feelings would have any effect on his ability to be impartial.
> At the <u>Batson</u> hearing, the prosecutor gave the following explanation for his challenge of Edmonds:
>> "Mr. Edmonds indicated that he was a student until he was 45 years of age, that he was single, he had been - - he was 53 years old, had been employed at the CTA for eight years and that he had been a member of an [<u>sic</u>] Operation PUSH.
>> It was the 8-year employment at the age of 53 years of age and that statement that he had been a student until 45 years of age, coupled with

10

       membership of PUSH. The totality of those circumstances that the State
       exercised its fourth peremptory challenge."
The prosecutor further stated that instability in the community was demonstrated by the fact that Edmonds had been a "professional student at the age of 45 years old."

    (2) Carlos Lavington
    This venireprerson was a 44-year-old supervisor for the Chicago Park District. Lavington worked for that entity for 18 years; described his job as "dealing with kids all day, gym;" and was a widower with two small children. He stated that sometime in the late 1970's he was called to testify as a defense witness in a robbery case, a fact which he stated would not affect his ability to be fair and impartial.
    At the <u>Batson</u> hearing, the prosecutor explained that he exercised a peremptory challenge at to Lavington because "he had testified as a defense witness in a robbery trial and that he was employed working with kids."

    (3) Alberta Collins
    This venireperson was 50 years old; was single; was unemployed since 1972; lived in Chicago for 28 years; and was active in the Church of God and Christ. When asked what she did in her spare time, she stated that she watched television or read her bible.
    At the <u>Batson</u> hearing, the prosecutor stated that he exercised a peremptory challenge as to Collins because she "was single and unemployed since 1972 and that she read the Bible." The prosecutor stated that the fact that Collins read the Bible gives "an inference that she would be against the death penalty."

    (4) Joyce Joshawa
    This venireprerson was 49 years old; was divorced; had been unemployed for four years; and had been terminated from her last employment as a factory worker. She lived at the same address since 1973.
    At the <u>Batson</u> hearing, the prosecutor stated that he exercised a peremptory challenge as to Joshawa because she "had been unemployed, terminated from employment and had been off work for four years."

    (5) Mark Anthony Gossitt
    This venireprerson was 31 years old; was single; lived in Chicago; and had worked as a security guard for two years. Before working as a security guard, Gossitt worked as a dancer and had done so since he was nine years old. Gossitt stated that as a dancer he traveled the United States.
    At the <u>Batson</u> hearing, the prosecutor stated that he exercised a peremptory challenge as to Gossitt because Gossitt had been a security guard for two years and prior to that time had been a dancer traveling around the United States. The prosecutor further stated that "[i]t was the area in the field of entertainment in relation to the nature of the

charge and the anticipated defense of drug intoxication that caused the prosecution concern regarding that individual."

At the conclusion of the Batson hearing, the prosecutor tendered his notes. The trial judge examined those notes, which it found to be "incredibly thorough" and totally corroborative of the Batson testimony. After hearing argument by both sides, the trial court concluded that the prosecutor had given valid and legitimate race-neutral reasons that were non-pretextual. The court specifically stated that in reaching that conclusion, it relied upon its knowledge of the prosecutor's "honor and good integrity."

Pecor, 286 Ill.App.3d at 75-77.

The State explained each of its reasons for exclusion. Four prospective jurors were excluded for reasons that included unemployment, instability in the community, prior testimony as a defense witness, and an inference that the venire person may be opposed to the death penalty. The court applied the requirements of Batson and found that each of the exclusions was not pretextual for racial discrimination.

The Appellate Court correctly and fairly applied the law. The only exclusion that raises any racial implication is that of Chuck Edmunds. Edmunds was excluded because he was a student until middle age and was a member of Operation PUSH. Edmunds' employment history and student status were race-neutral, but the Appellate Court questioned the racial implication of a membership in Operation PUSH. The Appellate Court presumed that, for the purposes of the appeal, Operation PUSH was an organization whose racial composition was predominantly if not exclusively African-American. The court treated this reason for exclusion with suspicion. The court found that the defendant failed to show that other venire persons who were chosen as jurors belonged to other racially or ethnically focused organizations. The court also opined that, other than Operation PUSH, there were other race neutral reasons for excluding Edmunds. The Appellate Court determined that, when viewed as a whole, the independent race-neutral reasons

12

diluted the suspicion of race based exclusion which may have been created by Edmund's membership in Operation PUSH.

We reviewed the courts' analysis with regard to Chuck Edmunds because we were cognizant that membership in operation PUSH could be a pretext for racial exclusion. We conclude that the petitioner failed to present the court with similarly situated individuals who were not excluded and the State proffered a sufficiently race-neutral rationale for the exclusion. Therefore the Circuit Court and Appellate Court correctly denied petitioner's objection.

The Circuit Court correctly formulated and applied the law. It determined that the State's proffered reasons for exclusion were race-neutral. The Appellate Court engaged in a thorough evaluation of the trial court's analysis. Because both the Circuit Court and Appellate Court correctly applied the law to the facts, we will not second guess their conclusions. Furthermore, there is no evidence in the record to support petitioner's contention that the trial judge pre-determined the outcome. Based on an extensive review of the record we conclude that no Batson violation occurred.

### III. Ineffective Assistance of Counsel

Pecor argues that the Appellate Court's determination that he was not denied effective of counsel was an unreasonable application of the relevant facts to the law. Pecor argues that he was denied effective assistance of counsel when his trial attorney failed to call Dr. Daley during the defense case-in-chief. Respondent argues that the Appellate Court's application of the two prong test set forth by the Supreme Court in Strickland v. Washington was reasonable. Strickland v. Washington, 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984). After

examining the briefs and the Appellate Court's rationale, we find that the court's application of the Strickland two-prong test and its application to the facts were reasonable.

Strickland governs ineffective assistance of counsel claims. The petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Id. at 694. The court cannot grant federal habeas relief for ineffective assistance of counsel claims unless the state court's decision was contrary to or involved an unreasonable application of federal law as determined by the U.S. Supreme Court. 28 U.S.C. §2254(d)(1); Williams, 529 U.S. at 367. To show ineffectiveness of counsel a defendant must show that the counsel's representation fell below an objective standard of reasonableness. Strickland, 466 U.S. at 694. To establish prejudice he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 694. Judicial scrutiny of counsel's performance must be highly deferential. Id. at 689.

The Appellate Court held that trial counsel's performance did not qualify as ineffective assistance of counsel as outlined by Strickland. The Appellate Court held that Pecor did not satisfy the first prong of the test because the trial counsel's overall performance, including his choice to call Dr. Daily at sentencing, was not objectively unreasonable. The court noted that Pecor did not deny that he killed the victim, but rather argued that he did not possess the requisite state of mind to commit murder. Defense counsel called the defendant and an expert in pharmacology to support Pecor's contention that he did not possess the requisite state of mind to commit murder. At trial Pecor was given ample opportunity to assert his defense. Pecor testified on his own behalf and was able to explain to the jury in detail his history of drug and alcohol

14

addiction. The defense expert corroborated Pecor's statements by explaining to the court and the jury the effects of long term addiction and the reactions of an individual who is abusing drugs. The decisions made by Pecor's trial counsel were reasonable and strategic in nature.

Although the Appellate Court did not find that Pecor satisfied the first prong, the panel analyzed the facts and applied them to the second prong. The second prong of <u>Strickland</u> requires that counsel's performance prejudice the defendant. The Appellate Court discussed defense counsel's decision to call a pharmacology expert to testify in support of the intoxication defense. The defense expert testified that cocaine usage could have an effect on a person's memory, could cause blackouts, could affect a person's ability to act in a knowing fashion, and could affect a person's judgment and mind so that the person does not know what he intentionally is doing. In addition the defendant testified about his long-term alcohol and drug addiction and about his ingestion of cocaine and his physical reaction to the drug on the day of the murder and the days following the murder. The panel found that Dr. Daley's testimony at sentencing was not new and independent evidence but rather corroborative evidence. Since Dr. Daley's opinions were based in part upon her reliance upon the credibility of the defendant and the information supplied to her by the defendant, the Appellate Court determined that her conclusions would have been weakened by the State's impeachment of the defendant. The Appellate Court, after a thorough analysis, determined that the defense theory of intoxication was presented, the adversarial process was meaningful and the outcome of the trial would not have been different had Dr. Daley testified during the defendant's trial.

Defense counsel's decision to call Dr. Daley was strategic. We will not second guess a trial counsel's strategic or tactical decision. <u>United States v. Godwin</u>, 202 F.3d 969, 973 (7th Cir.

15

2000), cert. denied 529 U.S. 1138 (2000). The evidence presented at trial was sufficient to serve as a basis for acquittal. The jury weighed all of the evidence presented at trial that supported Pecor's defense theory of intoxication and found him guilty. At sentencing, the testimony by Dr. Daley was merely cumulative. Dr. Daley's testimony added nothing more to defendant's theory than the testimony which was presented at trial. The testimony served only to corroborate the trial testimony by Pecor and the defense expert. This decision represents a strategic choice by defense counsel, and it was not objectively unreasonable. Therefore it cannot serve as a basis for overturning the conviction.

## CONCLUSION

The State courts accurately applied the correct federal law. Therefore, Pecor's petition for a writ of habeas corpus is denied. This case is terminated.

Wayne R. Andersen
United States District Judge

Dated: August 31, 2001